IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Nos. 09-278, 279 and |
| | ) | 11-37 |
| | ) | |
| GREGORY J. PODLUCKY | ) | |

GOVERNMENT'S SENTENCING BRIEF

AND NOW, comes the United States of America, by its attorneys, David J. Hickton, United States Attorney for the Western District of Pennsylvania, and James Y. Garrett and Robert S. Cessar, Assistant United States Attorneys for said district, and hereby submits the following:

Gregory Podlucky has filed a Position with Respect to Sentencing Factors (document 271 at Cr. No. 09-279) offering objections to the Pre-Sentence Report, specifically the computation of loss, for a lengthy list of reasons.  He has also argued in both his foregoing Position, and a Sentencing Memorandum (document 293 at Cr. No. 09-279), that the Court should exercise its discretion to vary from the guidelines for certain reasons.  In the government's view, there is logical overlap in the evaluation of the objections and the arguments for variance, and it will respond to both pleadings in this Sentencing Brief, beginning with the objections to loss.[1]

---

[1]Podlucky and other defendants in Cr. No. 09-279 have raised objections to the victim status of certain entities and

From the perspective of Guidelines impact on the sentencing decision, Podlucky's list of objections has minimal significance, since by agreement between the parties the maximum sentence available, 20 years, is already below the Guidelines range which would result if his objections to the loss were all sustained. (See Defendant's Position with Respect to Sentencing Factors, p. 4, subparagraphs q and u, stating that the guidelines adjustment for loss should be 28 levels rather than 30 levels, which would yield a final offense level of 41 and a sentencing range 324-405 months.)

Nevertheless, it is worth observing as will be seen in the ensuing discussion that Podlucky's objections are Orwellian: the product of a studied effort to rewrite history to suit his wishes. This is much the same as his manner of operating Le-Nature's in years past by continuously rewriting the history of its performance so the outcome of audits would suit his wishes. No more than a leopard does Mr. Podlucky change his spots.

The better to illuminate those spots, the government will briefly discuss here three of the attempted rewrites.[2]

---

individuals identified by the government for the Probation Office and the Court. The government will respond to the objections concerning specific parties identified as victims in a separate pleading.

[2]By this pleading, the government is formally proffering for use at sentencing the substantive information set forth. The government's proffer is based on information publicly testified to by witnesses in the trial of co-defendant Robert Lynn at Cr. No. 09-279. While defendant was not involved in that trial, the information provided herein is also consistent with Jencks

*A. SEA Resins.*  Paragraph 16 of the Presentence Report refers to the fact that during the course of the scheme to defraud Podlucky would frequently use Le-Nature's funds to purchase jewelry in transactions that were disguised on the company records as ordinary, legitimate business transactions.  The report cites as examples two jewelry purchases disguised in the records as payments to a vendor under the name "Sea Resins," for a product used in the bottling process.  The report also mentions that additional transactions recorded in Le-Nature's records purporting to involve payments to the same vendor were completely fictitious.

Podlucky objects in Defendant's Position with Respect to Sentencing Factors, p. 2, subparagraph d, as follows:

> With respect to paragraph 16, SEA (Southeast Asia) Resins was an international resin manufacturer based in Asia.  The purchases from SEA Resins was (sic) used to manufacture bottles and/or sold in the open market.

Podlucky's objection explaining the function of resin "purchases" simply ignores the key findings contained in this portion of the Report: (a) that no such payments were made, (b) unless they were actually disguised jewelry purchases.  In recognizing there are two equally important findings at issue, it is

---

material provided to defendant Podlucky prior to his guilty plea.

useful to remember a key element of Podlucky's scheme relating to deceiving auditors: for every dollar of fictitious receipts booked in order to inflate Le-Nature's sales, to maintain the balance in Le-Nature's financial records essential under accounting principles it was necessary to show an offsetting disposition of equal amount, and (since no funds actually existed) of equally fictitious character.  Consequently, when a fictitious payment of $20 million (or whatever amount) to Sea Resins was recorded in Le-Nature's books, what it really represents is another $20 million of false receipts to deceive investors and lenders.

From the latter half of 2002 on, the key tool in defendant's hands for achieving this balance was the phony Merrill Lynch account statements created by him with the aid of employee Ken Staiger's Photo Shop expertise.  As explained by Tammy Andreycak, and verified by comparison to the real Merrill Lynch account statements, using the template created by Staiger, Podlucky would simply insert both fictitious deposits and fictitious disbursements into the phony statements.  In many cases the fictitious disbursements were claimed to be deposits on capital equipment (see footnote 9, below), but others were purported operational expenses including not only fictitious payments to Sea Resins for resin but also fictitious payments to another purported vendor, Pakit, for packing supplies. Podlucky would later provide Andreycak lists of monthly journal entries, to direct her how to record the transactions in the Le-

-4-

Nature's phony general ledger, which of course supplied the basis for its false financial statements.

As correctly described in the presentence report, the only actual purchases booked by Le-Nature's under the name Sea Resins were purchases of jewelry and model trains that Podlucky disguised as legitimate operating expenses.  As with the fictitious payments, these payments (constituting diverted funds resulting in income to Podlucky which was the basis for tax evasion charges to which he pleaded guilty at Cr. No. 09-278) were recorded as operating expenses in the general ledger by Andreycak pursuant to Podlucky's monthly journal entry lists.

Attached hereto as exhibits are documents demonstrating the foregoing description: Exhibit 1 (Sea Resins summary spreadsheet), Exhibit 2 (phony Merrill Lynch account statement reflecting a sample fictitious wire transfer to Sea Resins of $20,618,677.92), Exhibit 3 (real Merrill Lynch statement with no reference to the sample fictitious wire transfer), Exhibit 4 (phony invoice for sample fictitious transaction recovered in Le-Nature's files), Exhibit 5 (monthly journal entry list corresponding to the foregoing fictitious transaction, given by Podlucky to Andreycak to direct entry in general ledger), Exhibit 6 (documentation of payment to Fine Gems International (jewelry) 2/13/06 booked as expense to Sea Resins), Exhibit 7 (documentation of payment to Van Cleef & Arpels (jewelry) 2/22/06 booked as expense to Sea Resins), Exhibit 8

-5-

(documentation of payment to Grand Central (trains) 3/2/06 booked as expense to Sea Resins), Exhibit 9 (documentation of payment to Verdura (jewelry) 3/8/06 booked as expense to Sea Resins), and Exhibit 10 (documentation of payment to Van Cleef & Arpels (jewelry) 6/30/06 booked as expense to Sea Resins).

*B. Stock Redemption.* Paragraphs 28 and 29 of the Presentence Report provide an abbreviated summary of major allegations of the money laundering indictment filed at Cr. No. 11-37, to which defendant Podlucky pleaded guilty at Count One, charging conspiracy. As correctly described in the Report, the conspiracy involved the sale in 2009 and 2010 of rare diamonds and sapphires acquired in 2001, 2004 and 2006 with funds diverted from Le-Nature's pursuant to the scheme to defraud, and monetary transactions conducted with the $2.9 million proceeds of the sales in a variety of nominee names used to hide the activity.

Podlucky objects in Defendant's Position with Respect to Sentencing Factors, p. 3, subparagraphs n and o, as follows:

> n. With respect to paragraph 29 [describing the acquisition of the gems] these items were applied against the $5,000,000 stock repurchase allowance in the Stock Purchase Agreement. (See Exhibit K, attached) [referring to an attachment to Podlucky's objections].
>
> o. With respect to paragraph 29, there was never any attempt to hide the possession of three diamonds and seven

Kashmir sapphires as such items were the property of Twilight Palm Canyon Asset Management Trust via the $5,000,000 stock repurchase allowance referenced in PSIR Paragraph 28 (sic; presumably should instead cross-reference subparagraph n, above).

Although Podlucky's objection is almost insolubly cryptic, it boils down to this: some time after the Pelham fund invested in Le-Nature's by a purchase of preferred stock in 2001, he redeemed personally owned shares of Le-Nature's stock worth $5,000,000 (as the agreement with Pelham allowed) and received payment ultimately in the form of the gems at issue. Consequently the gems were not purchased with diverted funds, but instead with funds to which he was entitled. Given this, he contends there was no need to "hide" anything, and the use of straw party names reflected no more than innocent financial planning.

Again this objection simply attempts to build an alternate reality on an isolated element. But there are several problems. First, although Podlucky demonstrates he had the right to redeem stock, he offers no documentation that any such stock redemption ever occurred. Such a transaction could not be conducted between the company and its CEO without documentation: as verified by two former Le-Nature's CFOs, John Higbee and David Getzik (See Affidavits, Exhibits 11, and 12) it would need to be recorded in the company's general ledger and disclosed in its audited financial

-7-

statements.   It would also require approval by the Board of Directors and notation in the stock register.   None of this ever happened.[3]

Second, since there was no market for Le-Nature's stock, its value could only be determinable by reference to its financial statements.   While at face value the financials would suggest a considerable value for Le-Nature's stock, the statements were riven with fraud, as the defendant knew better than anyone.   The vast scope of the fraud is abundantly demonstrated by the report and testimony of forensic accountant Ray Strong.   The economic reality is simple: there was no value to Le-Nature's stock and, bluntly put, anything taken by Podlucky in exchange for it was stolen.

Third, even if there had been a stock transaction, at most that would be pertinent to the financial relationship between Podlucky and Le-Nature's, and might show the funds were not diverted from the

---

[3]As it happens, the government found in its investigation a purported letter from Podlucky to John Higbee dated August 1, 2003, the tenor of which would potentially substantiate formation of an intent on the former's part to redeem stock for $5,000,000 as allowed by the Pelham agreement consistent with his current objection (see Exhbit 13).   Neither Higbee nor Getzik has any recollection of the letter or its subject matter, which seems a telling point.   But more interesting still, Podlucky does not cite it in support of his objection.   Upon reflection, the reason for the omission is not hard to discern: one of the gems at issue, a diamond worth $241,145.76, was acquired from Blackstone Jewelers on March 17, 2001, more than two years before the date of the letter, so to the extent the letter might substantiate an intent by Podlucky to exercise the right of redemption, it would fix formation of that intent at a time later than the acquisition of at least that stone, and thus actually contradict his current objection.

company.  Such a showing, would not, however, also demonstrate that
the funds were not proceeds of the scheme to defraud.  On the
contrary, the money used to purchase these stones in fact consisted
of funds obtained from lenders by fraud.  As Ray Strong has
thoroughly demonstrated, Le-Nature's operations were always
conducted at a substantial loss and to the extent there were moneys
available in its accounts to spend on payments for jewelry, it was
only because funds had been advanced by lenders under the influence
of misrepresentations made and caused to be made by Podlucky.  When
he bought jewelry, it is plain that he bought it with proceeds of
the scheme.  Right of redemption or not, he had plenty to hide in
using straw parties.

     *C. Real World/Counterpoint limitations.*  In Defendant's
Position with Respect to Sentencing Factors, p. 2, subparagraph c,
Podlucky objects to the Presentence Report's description (at
paragraph 14) of the manner in which Tammy Andreycak falsified Le-
Nature's sales and gross receipts at his direction, as follows:

          With respect to paragraph 14, The Real World and
          Counterpoint software would not allow for the relieving
          of inventory for free goods, BOGO deals and other contra-
          revenue items.  As such, sales invoices were generated to
          relieve inventory so there would be an accurate finished
          goods count at month end closing.  The printed invoices
          were then batched and an entry was prepared to debit trade

spending and credit accounts receivable, (See, Exhibit F attached). Additionally, Wachovia required that all sales volumes be converted to eight ounce equivalents for which the Real World and Counterpoint software could not achieve so all tea concentrate sales to all customers, including the classified customers, were converted to eight ounce equivalents by generating sales invoices and tallying cases sales from these invoices. It should be noted that Le-Nature's, Inc. was in the process of implementing SAP software to overcome these shortfalls in the accounting system.

This is essentially meaningless gibberish. Whatever the veracity of the shortcomings attributed by Podlucky to the Real World/Counterpoint software, his objection blandly ignores the reality that its exclusive use was to maintain Le-Nature's phony second set of books and fabricate phony sales records. Only he and Andreycak had access to RW/C, and other company employees tracked Le-Nature's actual business (including all actual sales and inventory) in the separate Navision software. If RW/C imposed any limitations, the only constraint was on the manner of executing the scheme to defraud.[4]

---

[4]There is an additional respect worthy of comment in which Podlucky seems to have attempted to rewrite history in his submissions to the Court: in his Sentencing Memorandum, Part II, The Origins of the Fraud (p. 3), he indicates that the fraud

With the exception of arguments reciting his "help" to the bankruptcy trustee, made repeatedly by Podlucky both as generic objections to loss and in seeking a variance (discussed herein below), the government will not offer additional detailed responses to the loss objections.  To the extent that Podlucky's additional objections are comprehensible, they boil down only to denials there was any fraud and are inconsistent with his guilty plea.  An example is the argument (offered at Position, p. 2, subparagraph e) that "the majority of tea and tea component sales were bartered," citing to a note from one of the fraudulent financial statements (Podlucky's Exhibit G).  As the Presentence Report correctly states there were essentially no tea sales, and tea inventory was carried

---

originated only in 2003, after Le-Nature's began obtaining funding from Wachovia.  In fact, the scheme to defraud lenders and investors had been in progress for years at that point.  Attached hereto are two exhibits to demonstrate this reality.  First is the Memorandum of Interview of Gina Ciocco (Exhibit 14, personal data redacted), an employee of Le-Nature's in the mid-1990's who preceeded Tammy Andreycak as Podlucky's instrument in creating phony sales records.  Ciocco was not comfortable with her assignment, and quit LNI in May 1998.  She recalled in particular that around Christmas 1997 she was required to work through the weekend to create an entire year of phony invoices.  Podlucky told her it needed to be done because someone was coming to look at the company books, and threatened to fire her if she did not help. Second is a spread sheet (Exhibit 15) prepared by forensic accountant Ray Strong of the phony transactions during the years 1997-2002, in which Podlucky induced lenders to forward money for equipment to co-defendant broker Donald Pollinger (who testified at the Lynn trial).  As shown in the spread sheet, out of $92 million advanced by lenders through Pollinger, $77 million was not spent on equipment at all because Podlucky induced Pollinger to forward it instead to accounts he controlled.  The bulk of the $77 million was then falsely recorded as receipts on sales.

on Le-Nature's books at a grossly inflated value.  Witnesses Eugene
Reeves, Richard Lipke, Jack Shea, Ray Strong, and Tammy Andreycak
testified on these points at the Lynn trial.  At bottom, defendant
is simply asserting the Presentence Report and the witness testimony
are wrong, based solely on his bald say-so and the discredited Le-
Nature's financial statements, the latter constituting nothing less
than the primary tool of his fraudulent scheme.  Stubborn
obstructionist arguments like this are insufficient to overcome a
prima facie showing of loss, United States v. Fumo, ___ F3d ___,
20111 WL 3672774 (3rd Cir. 2011).

Turning to the subject of Podlucky's "help" to the bankruptcy
trustee, objections are serially made in his Position (p 2-4,
subparagraphs a, f, p, q) that the loss computation should be
reduced for the value of recoveries by the trustee purportedly
achieved with his assistance.  However, a loss computation can be
reduced only by collateral (not in issue here) or value returned by
the defendant personally to victims before the offense was detected.
Guidelines §2B1.1, Commentary, Application Note 3(E).  Whatever else
may be said about the defendant's purported help, it did not begin
until after he pleaded guilty, and is thus no ground for any
reduction of the loss.  See United States v. Merriman, 647 F3d 1002
(10th Cir. 2011); United States v. Fumo, supra.

Defendant goes on to urge in his Sentencing Memorandum that the
Court should take account of his help to the trustee in granting a

-12-

sentencing variance from the guidelines.  There are other reasons too that he urges the Court to vary from the guidelines, including the claimed absence of any greed in committing the offenses and an extended argument that sentencing severity has no deterrent effect. As is now well understood, all of these arguments must be considered by the Court in the context of sentencing principles set out in 18 U.S.C. §3553(a).  Before turning to the ultimate issue of the guidance to be found in that statutory provision, the government will briefly note the problems with each of the defendant's foregoing individual points.  And it will also attempt to lend some clarity to the specific question to be resolved in imposing sentence in this case in light of the plea agreement, for in reality the defendant has already been assured a variance from the guidelines.

Concerning his purported assistance to the trustee, Podlucky advises the Court as follows (Sentencing Memorandum, p 5-6):

> Podlucky, after his change of plea, sought out counsel to the liquidation Trustee and agreed to cooperate with the liquidation trustee in his attempt to recover assets in the LeNature's bankruptcy.  Podlucky was debriefed, at length, regarding, inter alia, Wachovia, CIT and Krones. The Wachovia case had been progressing slowly through discovery and within weeks after Podlucky changed his plea and began his cooperation with the Liquidation Trustee, the Wachovia Parties (Wachovia Bank N.A./ n/k/a Wells

Fargo Bank, N.A. and Wachovia Capital Markets, LLC, n/k/a Wells Fargo Securities) entered into a Settlement Agreement & Release dated July 20, 2011, wherein the Wachovia parties withdrew their bankruptcy claims of (listed at $258,837,115.19 on the victim table submitted with the PSIR) (sic: parenthesis in original) and agreed to pay to the LeNature's Trust the sum of $38,000,000. Thus, partly as a result of Podlucky's cooperation, counsel contends that the settlement with the Wachovia Parties (when finally funded, bankruptcy court approval having been obtained) realized a benefit to the LeNature's estate of $296,837,115.19. Podlucky is still cooperating with the liquidation trustee in the cases against CIT and Krones.

The government believes this is assertion is significantly erroneous, to the extent that it claims the settlement with Wells Fargo/Wachovia (hereinafter referred to as Wachovia) resulted in a benefit to the trustee (more accurately, to the creditors) of over $296 million. The government understands that Wachovia withdrew its own claim in the bankruptcy proceedings worth approximately $23 million (representing its share of the September 2006 credit facility), not the claims of other lenders; any claim originally made by Wachovia on behalf of participants in the facility was made only in its legal capacity pursuant to the credit agreement as their

agent.   The participants' claims remain.   Therefore, the maximum benefit was approximately $61 million, not $296 million. Furthermore, it is debatable at best that Podlucky's cooperation with the trustee played any role in inducing Wachovia to agree to a settlement, which is nothing if not a common outcome in expensive commercial litigation.   See the letter of Robert Fuller, Esq. counsel for Wachovia, attached as Exhibit 16.

While it is important to be aware of the foregoing reality in evaluating Podlucky's claim that he is entitled to credit for helping the trustee, even more important is the basic principle he overlooks.   It boils down to this: it is inappropriate for a criminal defendant to claim credit merely for shifting the financial burden of the harm he caused from one party to another.   Yet it can be readily seen this is the essence of Podlucky's claim by considering the trustee's civil complaint -- regardless of its ultimate factual and legal merit, no theory raised in the complaint exonerates defendant as the originator of the harm, or seeks relief for any harm untraceable to him.   Whatever has happened, or will happen, in the bankruptcy related litigation has not reduced, but only reallocated the harm caused by Podlucky.   Thus his "help" stands in sharp contrast to the recovery of collateral or the voluntary return of property prior to detection of the scheme, events recognized by the guidelines as appropriate grounds for reduction of loss.   Indeed, it is obvious suits were brought by the

-15-

trustee against third parties in the effort to find deep pockets. This is not to criticize the trustee: it is his job to maximize the recovery for the bankrupt estate.  But assistance by the defendant in that effort, whatever its possible value to completion of the specific task, does not by some alchemy transform him into something other than the original author of all the harm.  If the defendant himself had deep pockets, it would not have been necessary for the trustee to look to third parties at all.

The government does not say, however, that assistance by a criminal defendant in parallel civil litigation could never be relevant to the factors specified in 18 U.S.C. §3553(a). Conceivably in some circumstances such assistance could betoken sincere remorse for wrongdoing and a commitment to set things right, which the government believes would be entitled to due consideration by the Court.  However, there is nothing to suggest such sincerity, remorsefulness, and commitment on the part of the defendant Podlucky.   Instead, his sentencing pleadings are rife with repetitions of his past deceit, and attempts to minimize his criminal conduct.  And, if he wanted to set things right he should have given the trustee the diamonds and sapphires he caused to be auctioned for $2.9 million in October 2009 and April 2010.  Instead (as irrefutably established by his plea at Cr. No. 11-37) he chose to use them for personal benefit.

An additional point made by Podlucky in urging the Court to vary from the guidelines is his claim that his crimes were committed without greed.  Supposedly he acted simply from zeal to build Le-Nature's rather than pursuit of wealth.  While the government acknowledges that during the years the scheme to defraud was executed, Podlucky worked long hours, that is not to say there was no self-indulgence by himself and family.  Instead, for example, they drove fancy cars, acquired more than $30 million worth of jewelry, and built themselves a lavish mansion (never completed despite expenditure of more than $10 million).  For the years 2003-2006 alone, Podlucky evaded taxes on more than $28 million of unreported income.  So contrary to his claim, the government submits the evidence abundantly shows greed.  But it is not just that the facts show an intent to accumulate wealth; Podlucky's business diligence was not in pursuit of an honest day's work but in pursuit of a massive fraud.  If he wanted to build Le-Nature's, he didn't want to take the trouble to do it honestly.  What is that if not greed?[5]

---

[5]Additional individual points made by Podlucky in support of a variance are the claims (Sentencing Memorandum VII-C) that (a) statistics for men of his record and age show he presents a low risk of recidivism (b) his conduct was aberrant, (c) he will never in the future be in position to commit additional corporate fraud and (d) a short sentence will enhance the possibility of earning funds to pay restitution.  The government replies as follows: (a) Podlucky's commission of money laundering while on bond affords more insight into the risk of recidivism presented by him as an individual than any statistics, (b) Podlucky devised and executed an elaborate, long-running scheme to defraud, which is not

As noted above, Podlucky also makes the argument, focused exclusively on but one of the §3553(a) factors, that there is no deterrent value to a severe sentence compared to a lenient one, which is built on quotes from the writings of sociologists such as the following (Sentencing Memorandum, p. 13): "Certainty of punishment is empirically known to be a far better deterrent than its severity." The problem with defendant's argument, however, is that it fails to reckon with the uselessness as a matter of practicality in a real world context of the theoretical notion of certainty found in these writings.

Simply put, certainty of punishment does not exist, because detection of crime and apprehension of the culpable never has and never will attain that level of efficiency. We can all agree that people almost universally abhor being caught for bad conduct. But that is not reality and provides no real world insight for the criminal justice system.

It can be assumed for the sake of discussion that by far the majority of people are deterred from committing fraud by virtue of their own morality, or the imperfect risk of being caught, but in the absence of certainly, for at least a small percentage of the

_____

isolated conduct suited to characterization as aberrant, (c) crime can be committed in any context by one so disposed, not just in a corporate office, and (d) no matter what the sentence there is no likelihood that Podlucky will ever have a capability to pay restitution of magnitude significant in comparison to the amount of the loss.

-18-

population deterrence is a function of risk-benefit analysis.  The question of whether a severe sentence affords more deterrence than a lenient one involves only that small percent of the population who lack a moral compass and remain coolly unconcerned with the risk of being caught.  The government has no empirical data, but common sense and the writer's 40 years of experience as a prosecutor certainly suggest that a sentence, for example, of 240 months gets more attention in the real world than a sentence of 120 months.  The rate at which deterrence increases with severity may difficult to assess, but any quantum of deterrence is worthwhile.  He who asserts there is none, needs more than a discussion of the theoretical value of certain punishment to prove his point.[6]

While the sentencing guidelines in this case call for a sentence of up to life imprisonment, the guidelines no longer occupy

---

[6]For those potential offenders to whom deterrence is a function of risk-benefit analysis, presumably the reward of executing a scheme to defraud is weighed against the risk and the cost of being caught.  Clearly if risk appears relatively slight, only a heavy cost (including a severe sentence) would give weight to deterrence.  Even the sociologists cited by defendant appear to recognize this reality: for example the quote contained in Podlucky's Sentencing Memorandum, reiterated above, does not assert that sentence severity is ineffective as a deterrent, only that it is less effective than certainty, a proposition with which the government agrees in the abstract.  Since in the guidelines, "loss" functions as a proxy for reward, the philosophy of increasing sentencing range in accordance with amount of loss is nothing other than a logical mirror image of risk-benefit analysis.

a controlling position.[7]   Considering this in conjunction with the collective experience of the United States Attorney's Office in the sentencing of white collar cases in this District, and giving due weight to the complexity of the case if a trial had been required, the government agreed that a sentence here of twenty years would be sufficient on a guilty plea.   Although the range provided by the guidelines would allow a sentence of much greater severity, in the government's view a sentence of imprisonment longer than twenty years would not be necessary to satisfy the objective of sufficiency to achieve the purposes of a sentence as prescribed in 18 U.S.C. §3553(a).

Thus, while the government suggests that the specific arguments for a variance made by Podlucky in his Position and in his Sentencing Memorandum lack merit, from a formal, procedural perspective the government obviously does agree with the conclusion that a variance is appropriate -- that is expressly what the plea agreement calls for.   But it is important to recognize that the plea agreement does not transform the sentencing issues: the starting point for the defendant's arguments is not that he should have a variance from the 20 year sentence allowed by the plea agreement, but instead a variance from the guidelines range.   So even if the Court were to find some merit in any of the defendant's arguments,

---

[7]A sentence of up to life is called for in the guidelines sentencing table.   However, under Guidelines §5G1.2, the actual sentence would be limited by applicable statutory maximums.

the government suggests that possibility is fully accounted for by the sentence variance guaranteed by the plea agreement.

Defendant's myriad arguments addressed to the Court's discretion under §3553(a) begin logically with a character reference by Dan Dumas, Senior Vice President, Southern Baptist Theological Seminary, who based on a long association between them offers assurances that Podlucky has learned from his legal troubles and is now a reformed man.  While reformation of human beings is possible, commentators on the human condition have often remarked on the tendency for people to show the face they want to be seen, while hiding the opposite stranger within.[8]  So we can assume that Vice President Dumas' opinion is sincere, while recognizing the risk that it errs.  If the best window to a man's character is his conduct, defendant's conduct here in attempting even at this late date to mislead the Court to believe that the loss computation should be reduced for factors such as SEA resins and redemption of stock, demonstrates that the reformed character attributed to him by Vice President Dumas is as much a product of deceit as were the Le-

---

[8]For example, consider the words penned by Billy Joel in "The Stranger:"

> Well we all have a face
> That we hide away forever
> And we take them out and
> Show ourselves
> When everyone has gone
> Some are satin some are steel
> Some are silk and some are leather
> They're the faces of the stranger
> But we love to try them on.

Nature's financial statements in earlier years, when defendant successfully projected the Le-Nature's mirage on the financial landscape to the prejudice of sophisticated lenders for an extended period.

Despite the now diminished legal function of the guidelines, the government seldom disregards them and does not do so lightly: they are entitled to respect as a reflection of the will of Congress, and embody much careful analysis by an expert body.  It is fair to say -- particularly in a white collar case unaffected by statutory minimum sentences -- that if the characteristics of an offense add up to a life sentence in the guidelines calculus, it must be an offense of extraordinary magnitude.

That is clearly so here.  Indeed, this case is historical, involving a loss of unprecedented size in this District, and deceit of unmatched scope and genius.  For these reasons the case strongly calls for a sentence correspondingly unique.  In light of the plea of guilty and history in this District, twenty years is that sentence.[9]

---

[9]On the matter of scope and ingenuity of the scheme to defraud, consider its Krones aspect, summarized in paragraph 18 of the Presentence Report, in which Podlucky essentially made $118 million out of nothing -- but accomplished even more than that remarkable feat.  Here, Podlucky's first step was to create fictitious records showing LNI made $100s of million of deposits for equipment to Donald Pollinger (a step which simultaneously appeared to increase the company's assets and supplied a disposition for fictitious receipts previously recorded, without which -- as noted previously -- an accounting imbalance would appear in LNI's records).  He then procured Pollinger's connivance

Consideration of the purposes to be achieved by a sentence, to which the Court is directed in 18 USC §3553(a), fully supports this conclusion.  Apart from guidance of a procedural character, the statute provides that the sentence shall be sufficient but not greater than necessary for the following purposes, 18 U.S.C. §3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense:
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (d) to provide the defendant with needed educational or

---

falsely to confirm receipt of the fictitious funds.  Next, he deceived equipment lessors and persuaded them to finance equipment which either had never been contracted for (i.e. didn't exist, even on paper) or for amounts twice the actual price.  Then, he persuaded Krones, the putative manufacturer, to overlook the utter lack of justification for its receipt of funds in amounts greatly exceeding sums due for equipment actually produced, and induced it blithely to forward the excess to Le-Nature's.  In some cases, he accomplished the latter through forged lender authorization, as described by witness Brian DeRusha of AIG.  Finally, he persuaded auditors to accept the receipt of the $118 million so forwarded by Krones as the "return" of deposits in the wake of successfully having secured long-term financing, thus in essence inducing them to equate imaginary funds to real.  The results? Of course, fraudulent proceeds received, but in addition, the fabricated appearance of integrity of LNI's financial records astonishingly substantiated, and the company's fictitious financial health confirmed.  In sum: a scheme of diabolical genius, in which the very receipt of proceeds was made to appear to confirm the facade of legitimacy, so the scheme could then be perpetuated anew.

vocational training, medical care, or other correctional

treatment in the most effective manner.

The statue goes on to direct that the Court should also consider

"the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct,"

18 U.S.C. §3553(a)(6), as well as the need to provide restitution,

18 U.S.C. §3553(a)(7).

Due to the aforementioned magnitude and uniqueness of the

criminal conduct at issue, the government submits that consideration

of the seriousness of the offense, of the disdain for law shown by

the defendant's extended and calculated conduct in devising and

executing the scheme, and of the manifest need for punishment of

such unscrupulous and harmful conduct, all individually and together

support well the imposition of a twenty years sentence as allowed by

the plea agreement.  So too in light of the notoriety of defendant's

crimes in the general media and in the financial industry as well

does the need for deterrence support a sentence of twenty years.

And especially since the defendant by his guilty plea at Cr. No. 11-

37 has admitted committing the offense of money laundering while on

bond for the charges pending at Cr. No. 09-278 and 09-279, and

accordingly has  clearly revealed that his judgment answers to

expediency rather than morality or legal restraint, likewise the

need to protect the public from potential further crimes by him

supports the sentence of twenty years.    In light of the

extraordinary nature of the offenses, a lesser sentence would not be sufficient to achieve these purposes.   And considering that defendant Podlucky is a highly educated man of sophistication, there is no apparent need for the sentence to provide him access to training, medical care or the like, which could in any way lead to a contrary conclusion.

The need to avoid sentencing disparity also supports imposition of a twenty year sentence.   As previously noted, to the knowledge of government counsel the magnitude of defendant Podlucky's fraudulent scheme is unique in the experience of this District, and partly for this reason the plea agreement allowing a sentence for Podlucky well below the guidelines range was considered appropriate.   Simply put, at the level of a twenty year sentence allowed by the plea agreement, there is no experience in this District from which disparity might arise.

While fraudulent schemes of extraordinary magnitude have been prosecuted elsewhere, it is difficult to measure comparability of one fraudulent scheme to another, or one sentence imposed on conviction for an extraordinary fraudulent scheme to another.   Each scheme is to some significant degree unique, a product of ingenuity and context.   Fraud is not like bank robbery, with a simple objective and a time-worn method.   The government submits that the imposition of a sentence with due regard to the extraordinary conduct at issue should be sufficient to avoid the risk of

-25-

inappropriate disparity.[10]

It is sometimes suggested that schemes defrauding individuals are more evil and dangerous than schemes defrauding financial institutions,[11] on the premise that individuals are more likely to lack the sophistication and resources to evaluate financial misrepresentations. Thus, in imposing a sentence to 150 years imprisonment on Bernard Madoff in a recent Ponzi scheme prosecuted in the Southern District of New York in which many victims were individual investors, the District Judge deplored his conduct as "extraordinarily evil." (That case also involved a loss considerably greater than even the huge loss here.)[12]

---

[10]Defendant has supplied the Court with a table of sentences imposed in fraud cases of varying length, evidently to demonstrate that a severe sentence may not be necessary and a lenient sentence may not result in disparity. But it is impossible from the table provided to glean anything about the individual conduct at issue, the focal point of sentencing as argued herein. Thus, for example, in this very case the government has entered into plea agreements with two of Podlucky's co-defendants providing for maximum sentences of five years. The government is quite confident there is no disparity between its position with regard to them and its position on Podlucky, because their limited roles as accomplices in the scheme stand in stark contrast to his extraordinary conduct as its principal.

[11]The United States Congress, however, has taken a different view by providing increased sentence maximums for offenses risking harm to a financial institution, e.g., mail fraud, 18 U.S.C. §1341. Presumably this reflects a perceived need to protect the financial marketplace due to its central role in the American economy.

[12]On the Madoff sentencing, see "Madoff is Sentenced to 150 Years for Ponzi Scheme," NY Times, June 29, 2009 (attached as Exhibit 17). For a report of a more recent prosecution, see "Investment Manager Gets 25-Year Sentence in Ponzi," NY Post,

However, while it is true that the victims in this case were primarily financial institutions, by no means should this be thought to diminish the seriousness of defendant Podlucky's conduct, as can be seen by considering context and ingenuity.  Although financial institutions clearly understand the risk of deceit and are able to marshal resources against it, they have an Achilles' heel, found by defendant Podlucky with his experience as a CPA: unshakable acceptance of audited financial statements.  Witness after witness has confirmed this reality -- under industry practice, professional lenders and investors simply do not go behind audits to reassess financial data which has already been evaluated in depth and confirmed by professionally accredited, publicly licensed, and presumptively independent experts.  Prospective lenders and investors clearly rely on the integrity of audits in judging the risk of advancing funds in a commercial setting no matter the exact nature of the proposed transaction, and considering that each audit represents the work of a team of accountants normally extending over a period of weeks, the cost of doing otherwise would be prohibitive. Inability to rely on audits would be destructively burdensome to the financial marketplace.

In this context, Podlucky attacked the Achilles' heel by corrupting Le-Nature's audits with an elegant fabric of deceit woven of forged documents and the connivance of a handful of accomplices.

_____

October 14, 2011 (attached as Exhibit 18).

Podlucky thus skillfully manipulated banks as easily as any tremulous widow by the ancient device of fabricating an illusion of return extending from years long past well into the future.  He never used the words "guaranteed return" as other con-artists might, but to update the old adage, a false financial picture is worth a thousand words.  We all can now see that the banks and other institutions should have known better, but the defendant's scheme -- like Madoff's -- germinated from his realization they would not. Whether or not defendant's conduct should be deplored as evil, the ingenuity, industry and magnitude of his extraordinary crimes are plain to see, as is the potential for harm to society implicit in contriving successfully to corrupt audits to obtain funding in the financial marketplace.  A sentence of twenty years imprisonment will adequately reflect these factors; a lesser sentence will not.

Respectfully submitted,

DAVID J. HICKTON
United States Attorney

s/ James Y. Garrett
JAMES Y. GARRETT
Assistant U.S. Attorney
U.S. Post Office and Courthouse
700 Grant Street
Suite 4000
Pittsburgh, Pennsylvania 15219
(412) 894-7364 (Phone)
(412) 894-7311 (Fax)
James.garrett@usdoj.gov
PA 12466
